Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| STEVEN B., and N.B., <br><br> Plaintiffs, <br><br> vs. <br><br> WHOLE FOODS MARKET, and WHOLE FOODS MARKET GROUP BENEFIT PLAN, <br><br> Defendants. | **COMPLAINT** <br><br> Case No.: 2:22-cv-00459-JCB <br><br> Judge Jared C. Bennett |

**COME NOW** Steven B., and N.B., on their own behalf collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Steven B. ("Steven") is a natural person residing in Superior, Colorado. He is covered by a self-funded plan, Whole Foods Market Group Benefit Plan, ("the Plan"), provided through Steven's employer, Whole Foods Market Group.

2. Plaintiff N.B. ("N.B.") is a resident of Superior, Colorado. As a beneficiary of his father's health insurance plan, he received treatment at Aspiro Wilderness Adventure Therapy ("Aspiro"), a licensed residential treatment facility in Sandy, Utah from July 25, 2018, through

1

September 26, 2018. He also received treatment at Elevations Seven Stars ("Elevations"), a licensed residential treatment facility in Syracuse, Utah from September 26, 2018, through March 8, 2019.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the treatment in question was rendered in the State of Utah.

5. Plaintiffs seek payment of N.B.'s denied claims from July 25, 2018, through September 26, 2018, with Aspiro, and December 6, 2018, through March 8, 2019, with Elevations pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

7. As a baby N.B. would have uncontrollable tantrums that would last 30-45 minutes at a time, and nothing would help calm him until he burnt himself out.

8. N.B. never learned how to crawl, he scooted until he learned to walk at 20 months old. He began occupational therapy and physical therapy due to his diagnosis of delayed gross and fine motor development, sensory processing, and modulation disorder, tactile hypersensitivity developmental coordination disorder, and low muscle tone.

9. When N.B. was four years old, he began preschool. Due to concerns regarding N.B.'s motor skills and behavioral issues, his teacher recommended an IEP. This was implemented

in 2008 and was subsequently re-evaluated in May 2009, at which time it was determined that he would no longer require an IEP.

10. In September of 2009, the same day that N.B.'s one-week-old younger brother was brought home after cardiac surgery, N.B. destroyed his bedroom, breaking furniture, picture frames, and books. That Fall, he began to damage his bedroom doorframe by repeatedly kicking on the door, and he also kicked several holes in the walls of their home.

11. In November 2009, due to concerns regarding his escalating behavioral issues, including aggression, defiance, explosive tantrums, severe mood swings, and enuresis, N.B.'s parents had him evaluated by the psychiatric and behavioral sciences department of Children's Hospital. He was then diagnosed with Oppositional Defiant Disorder, ADHD, and Mood Disorder. The treatment recommendations were to start intensive outpatient services and family therapy, as well as the Disruptive Behaviors Group.

12. Unfortunately, due to N.B.'s little brother's acute health issues and the significant distance of the hospital from their home, N.B.'s parents did not have the time or resources to act on those recommendations right away.

13. Throughout Kindergarten, N.B. did well academically but continued to struggle with his fine motor skills. He continued occupational therapy, and his parents utilized resources available through the Boulder Community Mental Health Center ("BCMHC") to improve his behaviors at home.

14. In the Fall of 2010, N.B. began first grade and his teacher again expressed concern regarding his distractibility, fine motor skills, and perfectionism in completing his schoolwork. To assist N.B., he began attending a social skills group at school.

15. Whiles N.B. was in elementary school, his tantrums evolved to include beating on his bedroom door. He did this repeatedly to the point that by the time he was ten years old, he has nearly destroyed his bedroom doorframe.

16. Due to distractibility, impulsivity, and attention issues, N.B.'s parents decided to seek additional treatment, support, and guidance by having N.B. meet with a psychologist who diagnosed him with ADHD.

17. In March 2011, N.B. underwent a neuropsychological evaluation, to clarify his current level of functioning, his diagnoses, the appropriate course of treatment, and his need for accommodations at school. He was diagnosed with a mood disorder (not otherwise specified), and developmental coordination disorder, and chose to defer a diagnosis of ADHD, as he felt that the struggles were primarily due to his mood disorder. The doctor recommended that they consult with a behavioral therapist to develop strategies to address N.B.'s irritability, impulsivity, and lack of emotional regulation. In addition, this was the first time N.B.'s parents became aware of N.B.'s executive functioning and processing speed challenges, as well as difficulties surrounding social skills.

18. It appears every evaluation or opinion resulted in a diagnosis of ADHD and some undetermined comorbid mood disorder. N.B.'s parents had him complete neuropsychiatric testing, which included a quantitative electroencephalogram. Based on the results of this assessment, N.B. was enrolled in a program at Brain Balance Achievement Center for four months. Unfortunately, this program made no progress with his mood disorders.

19. In late 2011, N.B. began working with an outpatient psychiatrist who prescribed medication for ADHD. In August 2012, at the recommendation of a co-worker, they switched doctors, who then prescribed different ADHD medications until one was found that seemed to

help. However, this doctor was at a loss to explain the behavior despite working with him for almost six years.

20. In 2015, N.B. left for school but never actually went. His parents were notified by the school and law enforcement had to track him down.

21. In Middle School, N.B.'s tantrums only continued to become more severe. He didn't have tantrums at school but would have so much built-up aggression that when he came home, he would unload. N.B. would stomp on his bike and throw it out in the street, throw his backpack around, yell, and destroy numerous pairs of glasses. N.B. would also obsessively pick at his skin until he had sores all over his arms and legs. He lacked interest in personal hygiene, time with friends, and planning and executing simple school projects.

22. In the Fall of 2017, N.B.'s parents hired an executive functioning coach through a firm called Access to Achieve after going through a series of therapists that stated they could not help N.B. with his severe emotional and behavioral issues. During this time N.B.'s parents had separated.

23. During 2018, he became increasingly hostile towards family members N.B.'s mother did not feel safe having N.B. live with her. The precipitating event occurred on January 25, 2018; N.B. became physically aggressive towards his mother over a haircut. N.B.'s mother called the sheriff and N.B. hid in the closet. The sheriff's deputies handcuffed him and took him to the emergency room where he spent the night. The next day N.B. was transferred to the pediatric psychiatry unit of Aurora Medical Center, he was there from January 26, 2018, to February 5, 2018. Upon his discharge, he was diagnosed with an obsessive-compulsive disorder with delusional thinking, autism spectrum disorder, and ADHD. He seemed to respond favorably to the

5

treatment, but that only lasted a very short time, and was back to having regular tantrums and aggressive outbursts.

24. N.B.'s medical team suggested that he may benefit from applied behavioral analysis therapy; however, they had no suggestions as to where they could receive those services. N.B.'s parents visited with several possible providers, but nothing worked out.

25. In April 2018, N.B.'s IEP was reevaluated to confirm his diagnosis of autism spectrum disorder, but he only met the diagnostic criteria for autism regarding the social domain. Because it was not in the school district's financial interest to diagnose N.B. with autism, they decided to withhold forming a conclusive diagnosis.

26. April 28, 2018, N.B.'s parents made an intake appointment at Centennial Peaks Hospital. Unfortunately, when it came time for the appointment N.B. refused to get in the car. After coaxing his parents were able to get him in the car, but once they were at the mental health hospital, N.B. refused to once get out of the car, swearing angrily. Eventually, his parents were able to get him in and started to curse at the intake staff and soon after that, the intake staff refused to speak with the family any longer. Her office staff called the sheriff's office to help remove N.B. and transport him to Avista Adventists Hospital.

27. April 29, 2018, N.B. once again went into another rage over a haircut. He was kicking the dashboard and hitting his father and younger brother. His father told him to calm down outside and N.B. kicked the door of the apartment, splintering the doorjamb. N.B. calmed enough for lunch and had plans to go to a farm for the afternoon. However, once they arrived, N.B. did not want to get out of the car and kicked the windshield of the car causing a large circular crack. N.B.'s father left him in the car for a minute and N.B. ran away, but eventually did return.

28. May 23, 2018, was N.B.'s middle school graduation ceremony. N.B. was to receive an award for his perseverance in middle school. N.B. got home from school this day, he was allowed to go for a bike ride and was home by 5:00 p.m., however, he refused to eat dinner and had a tantrum over clothes. He threw his clothes all around his room, and when his father left the room, N.B. followed his father hitting him repeatedly. The school called repeatedly wondering where N.B. was, but N.B. would not calm down, so they were unable to attend his ceremony. His father and little brother wanted to go for a walk and asked N.B. to join, he refused when they returned N.B. had destroyed the apartment, and when N.B.'s father asked him what happened he continued to say he didn't know. N.B.'s father called the sheriff to file a report. This incident lasted from 5:00 p.m. to 10:30 p.m.

29. June 4, 2018, N.B.'s father took N.B. and his brother on a trip to Iowa to visit some farms that his family owns. While visiting, he planned for them to ride the Boone & Scenic Valley Railroad, both boys were aware and were excited. After the railroad event, N.B.'s father suggested going to McDonald's to get ice cream, N.B. was very upset stating he would not eat anything from there and it had chemicals that will kill him. When they entered McDonald's and ordered their ice cream, N.B. became enraged, flipped his ice cream over on the table, and started hitting and shouting at everything he could. Later, N.B.'s father decided to go to another McDonald's to get the boys dinner and both boys ate calmly with no issues.

30. June 22, 2018, N.B.'s father took N.B. and his little brother on a weekend camping trip with the local Club Scouts troop. N.B. was already in a bad mood and continued to get worse. As N.B's father was getting packed, N.B. was following him around hitting him and his little brother. N.B.'s little brother and father ended up locking themselves in the bathroom, and N.B. was pounding on the door and demanding that they open it. N.B.'s father opened the door, and

which point N.B. and him collided. N.B. had been picking at a cold sore in his mouth all week and it again erupted and got blood all over him. N.B. went into his bedroom and lay on the bed crying, getting blood all over the sheets. After trying to console him, with no success, N.B.'s father decided to go for a walk to try and diffuse the situation. N.B. followed him because his father had his cell phone and pushed his little brother down on the ground and tried to push his father, but his father pushed back. This went on for about a half-hour and his father was so exasperated that he flung N.B.'s phone into a nearby storm drain which enrage N.B. more. Once they got home, N.B. went into the garage and came out with a hammer. He held it above his father and brother's head pretending like he was going to hit them. N.B.'s father was able to calmly retrieve the hammer from him. Afterward, N.B. took a fishing net, a broom, and a flashlight, and with the help of a stranger passing by, he eventually retrieved his phone which was still fully functional.

31. June 26, 2018, N.B.'s father had made an appointment to visit a new family therapist. N.B.'s father gave N.B. several warnings when they were going to leave for the appointment but when the time came N.B. once again refused to get into the car. N.B.'s father left for the appointment without him. When his father returned, N.B. was nowhere to be found but later figured out that he rode his bike to his mother's house with blood on his face and told her that N.B.'s father had hurt him. His mother's boyfriend stated that it appeared that he had smeared blood on his face from the cold sore that he had. N.B. repeatedly told his mother that his father had hurt him, and she needed to call the police, so she did.

32. On June 28, 2018, the sheriff's deputies came and investigated the child abuse allegations. The deputies eventually determined that N.B. was attempting to manipulate his parents into getting one of them into legal trouble.

33. July 28, 2018, under doctors' recommendations, they began working with a therapeutic placement specialist to determine an appropriate course of treatment. At the same time, a friend suggested testing at the Amen Clinic in San Francisco, California. N.B.'s father pursued this testing to confirm that N.B.'s conditions were not the results of a brain tumor, a genetic or physiological anomaly in his brain. In this report, N.B. was diagnosed with an unspecified mood disorder, unspecified anxiety disorder, and unspecified ADHD. After conducting thorough assessments, the placement specialist asserted that N.B. should be immediately placed in a therapeutic program and recommended the efficacy of intervention in a therapeutic outdoor behavioral health program, followed by a residential treatment center. After reviewing various programs, N.B.'s parents decided to admit N.B. to Aspiro Adventure Therapy ("Aspiro") with a planned admission date of July 24, 2018.

34. When July 24, 2018, came N.B.'s father was to deliver N.B. to the Salt Lake City, Utah airport, where Aspiro staff would meet them and transport N.B. to the facility. While they were on the bus, N.B. became angry and started kicking and hitting his father. By the time they got to the terminal, he refused to get into line for security. For 15 minutes, his father tried to convince him to get on the plane together, but he became more belligerent. N.B.'s father asked for a security officer's help, but N.B. swore at him, and soon after another officer arrived. N.B. told the officers that he was going to kill himself. The officers took this seriously and stated they were going to have him taken to a hospital and N.B. stated he didn't mean what he said but the officers explained they were obligated to have him taken for an evaluation. N.B. was transferred by ambulance to Aurora Medical, after N.B.'s father explained the situation N.B. was released after 30 minutes. N.B. and his father spent the rest of the day together while his father arranged for the

Right Direction crisis team to pick him up. That night, he was picked up and taken to Utah without issue.

35. He was admitted to Aspiro on July 25, 2018, until he was asked to be removed from the program on September 26, 2018. He was not making treatment progress and was diagnosed with autism spectrum disorder without intellectual impairment, ADHD, parent-child relational problems, Disruptive Mood Dysregulation Disorder, and Unspecified Neurocognitive Disorder. The doctor at Aspiro recommended that N.B. needs a higher level of care to provide treatment for his psychiatric and developmental disorders. Based on this recommendation N.B. was transferred from Aspiro to Elevations on September 26, 2018.

## PRE-LITIGATION APPEAL PROCESS FOR ASPIRO

36. Claims were submitted to the Plan by the Plaintiffs for N.B.'s treatment at Aspiro.

37. In March of 2019, The Plan sent multiple Explanation of Benefits Statements ("EOBs") showing N.B.'s claims were denied under note code "AY", which included the following explanation:

> **"AY – The procedure code submitted is not eligible for payment. Therefore, no benefits are payable for this service."**

38. On September 3, 2019, the family submitted a Level One Member Appeal.

39. In this letter, the family stated that due to the vague denial rationale, the family reached out to the plan administrator's human resources representatives to assist in obtaining further clarification regarding the denial.

40. On May 13, 2019, the family received an email including a response from one of United Healthcare's representatives, which states: **"Wilderness Therapy is considered "unproven" and is therefore not covered on the medical plan."**

41. The family received a second set of EOBs in May 2019, indicating that N.B.'s claims had now been denied under code "8L," which included the following explanation: "**Your plan does not cover this therapy service or associated expense.**"

42. There is no exclusion for intermediate behavioral health treatment. The plan outlines covered services for the treatment of behavioral health conditions under the "Mental Health Services" heading, which states:

> Mental Health Services include those received on an inpatient or outpatient basis in a Hospital and an Alternate Facility or in a provider's office. All services must be provided by or under the direction of a properly qualified behavioral health provider.

43. The following definition in the Plan's glossary for "alternate facility" is as follows:

> Alternate Facility – a health care facility that is not a hospital, or a facility that is attached to a hospital and that is designated by the Hospital as an Alternate Facility. This facility provides one or more of the following services on an outpatient basis, as permitted by law: Prescheduled surgical services, Emergency Health Services, Pre-Scheduled rehabilitative, laboratory, or diagnostic services. An Alternate Facility may also provide Mental Health Services or Substance-Related and Addictive Disorder Services on an outpatient basis or inpatient basis (for exaemple a Residential Treatment facility).

44. Aspiro is a 24/7 outdoor behavioral health facility that provides therapeutic services. Aspiro is licensed, nationally accredited, and meets the stringent requirements outlined in the Utah state regulations to provide these therapeutic services to adolescents in an intermediate, outdoor setting.

45. Aspiro meets the plan's definition of an alternate facility. In addition, the plan defines covered health services, as follows:

> Covered Service(s) – those health services, including services, supplies or Pharmaceutical Products, which the Claims Administrator determines to be: Medically Necessary, described as a Covered Services in this SPD, provided to a Covered Person who meets the Plan's eligibility requirements,

as described under Eligibility in Section 2, Introduction. Not otherwise excluded in this SPD.

46. N.B.'s claims were billed using the code "1006" which corresponds with "BH Outdoor/Wilderness."

47. On October 6, 2019, the Plan responded to the appeal upholding the denial on the basis that the Plan "does not cover this therapy service or associated expense."

48. On October 16, 2019, the family submitted an ERISA records request to obtain a copy of all reviewer notes, Plan documents, utilization review notes, physician's opinion, patient event notes, and all other pertinent internal activities including any clinical criteria used on the claim matters.

49. On November 15, 2019, the Plan sent a denial letter upholding the appeal stating N.B. could've received care in a mental health residential program setting with medication management, individual and family therapy.

50. On November 20, 2019, the family submitted a Level Two Member Appeal.

51. On December 26, 2019, the Plan sent a letter to the family upholding the denial. Specifically stating that N.B. was struggling with chronic issues related to low self-esteem and he was not having thoughts of self-harm or of harming others.

**PRE-LITIGATION APPEAL PROCESS FOR ELEVATIONS**

52. On December 10, 2018, the Plan sent a denial letter with Elevations from claims on December 6, 2018, through March 8, 2019. This letter states no further authorization could be provided.

53. The denial letter states "your child was admitted for treatment of depression and anxiety. It is noted your child has made progress and that your child's condition no longer meets

guidelines for further coverage of treatment in this setting. Your child's symptoms have improved. Your child is not currently at risk of harm to self or others."

54. However, claims from September 26, 2018, through December 6, 2018, were approved.

55. Based on recommendations of physicians at Elevations, N.B. needed to continue care.

56. On February 14, 2019, the family submitted a letter requesting all documentation concerning the decision to deny N.B.'s treatment.

57. On April 1, 2019, the Plan sent a response to the documentation request letter, enclosing the reviewer's case notes as well as a copy of the Optum Level of Care Guidelines that were used to justify the denial of benefits.

58. On December 26, 2019, the Plan sent a letter to the family upholding the denial. This denial letter stated that N.B. was struggling with chronic issues related to low self-esteem and he was not having thoughts of self-harm or of harming others.

59. On May 14, 2019, the family submitted a Level One Member Appeal for Elevations.

60. On July 9, 2019, the Plan sent a denial letter upholding the denial stating the member was not suicidal, homicidal, or assaultive.

61. On September 3, 2019, the family submitted a Level Two Member Appeal.

62. In this letter, it states the Plan erroneously processed the Level One appeal as a provider appeal.

63. On September 26, 2019, the Plan responded to the appeal upholding the denial.

## CAUSES OF ACTION

**(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))**

64. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.  29 U.S.C. §1104(a)(1).

65. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1104(a)(1)(D) and §1133(2).

66. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the H. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for N.B.'s claim denial, written in a manner calculated to be understood by the family;  2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the N.B.'s claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

**RELIEF**

67. WHEREFORE, the Plaintiffs seek relief as follows:

68. Judgment in the total amount that is owed for N.B.'s medically necessary treatment at Aspiro and Elevations under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

69. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

70. For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 8th day of July 2022.

        G. ERIC NIELSON & ASSOCIATES
        */s/ Laura Nielson*
        Laura Nielson

        *Attorney for Plaintiff*